[Cite as *CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, 2012-Ohio-897.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CSAHA/UHHS-CANTON, INC.<br>DBA MERCY MEDICAL CENTER | JUDGES:<br>Hon. William B. Hoffman, P.J.<br>Hon. Patricia A. Delaney, J. |
| Plaintiff-Appellee | Hon. Donna J. Carr, J. (sitting by<br>Assignment by the Ohio Supreme<br>Court) |
| -vs- | |
| AULTMAN HEALTH FOUNDATION<br>AULTMAN CORPORATION<br>AULTMAN HOSPITAL, AND<br>MCKINLEY LIFE INSURANCE<br>COMPANY | Case No. 2010CA00303<br><br>O P I N I O N |
| Defendants-Appellants | |

CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
Common Pleas, Case No. 2007CV05277

JUDGMENT:     AFFIRMED, IN PART; AND REVERSED,
IN PART

DATE OF JUDGMENT ENTRY:     March 5, 2012

APPEARANCES:

For Plaintiff-Appellee                          For Defendants-Appellants

LEE E. PLAKAS                                   ALLEN SCHULMAN, JR.
CHRISTOPHER M. HURYN                            BRIAN L. ZIMMERMAN
EDMOND J. MACK                                  Schulman & Zimmerman
Tzangas, Plakas, Mannos & Raies, LTD.           236 Third St. S.W.
220 Market Avenue South, 8th Floor              Canton, Ohio 44702
Canton, Ohio 44702

DANIEL R. WARREN                                JOHN R. GALL
SCOTT C. HOLBROOK                               KEITH SHUMATE
KAREN E. SWANSON HAAN                           PHILOMENA M. DANE
Baker & Hostetler, LLP                          HEATHER L. STUTZ
3200 National City Center                       CHRISTOPHER F. HAAS
1900 East Ninth Street                          Squire, Sanders & Dempsey, LLP.
Cleveland, Ohio 44114                           41 South High Street
                                                2000 Huntington Center
                                                Columbus, Ohio 43215-6197

*Per Curiam*

{¶1} Defendants-Appellants, Aultman Health Foundation, AultCare Corporation, Aultman Hospital, and McKinley Life Insurance Company appeal the October 19, 2010 judgment entries entered by the Stark County Court of Common Pleas. Plaintiff-Appellee is CSAHA/UHHS-Canton, Inc. dba Mercy Medical Center.

## STATEMENT OF THE FACTS AND THE CASE

{¶2} The citizens of Stark County and surrounding area are served by two full-service hospitals located in Canton, Ohio -- Mercy Medical Center and Aultman Hospital. The local population is fortunate to be able to choose between these two distinguished hospitals for their health care needs. However, not as well known to the local population is the competition between Mercy Medical Center and Aultman Hospital to serve the community's health care needs. A competitive business atmosphere drives health care choice. An individual patient's health choice is often dictated by his or her employer, who provides health insurance to its employees. The employer chooses the health insurance provider. The choice of health insurance provider is typically made upon the advice of an insurance broker. What follows is a narrative of the interplay of insurance company, insurance broker, and customer and the competitive business of health care services between Mercy Medical Center and Aultman Hospital.

{¶3} Aultman Health Foundation ("AHF") is a non-profit corporation and parent company of Aultman Hospital, AultCare Corporation, and McKinley Life Insurance Company. Aultman Hospital is a non-profit hospital. AultCare Corporation ("AultCare") is a joint venture between AHF and a local group of physicians, whom have no monetary ownership in AultCare, but serve in the governance of AultCare. AultCare is a

non-profit, third-party administrator ("TPA") licensed with the Ohio Department of Insurance. As a TPA, AultCare does not provide insurance but rather provides administrative services, such as reviewing and paying claims. AultCare enters into contracts with hospitals and physicians to create a "network" through which AultCare's customers receive medical services at contracted prices. McKinley Life Insurance Company ("McKinley") is an insurance company licensed through the Ohio Department of Insurance. McKinley provides various insurance products to employer groups and individuals. While AultCare and McKinley are separate companies, the name "AultCare" is used to refer to both entities. A customer with AultCare receives health care from providers within the AultCare network and Aultman Hospital is the only "in network" hospital.

{¶4} Mercy Medical Center ("Mercy") is also a non-profit hospital. Mercy does not own an insurance company; however, it does own a 20% interest in Ohio Health Choice ("OHC"). OHC sells access to a network of hospitals and physicians, including Mercy. Mercy also obtains patients through managed care contracts it has entered into with almost 40 insurance companies such as Medical Mutual, Anthem, Aetna, and United Healthcare. Mercy does not accept health insurance coverage by AultCare.

{¶5} Insurance companies and TPAs market and sell their products through independent insurance brokers. Independent brokers are licensed by insurance companies to sell that company's products, often among others. The brokers act as intermediaries between the insurance companies and businesses. Insurance contracts typically last for one year. At that time, the employers will decide whether to renew their insurance coverage or obtain new coverage. Brokers will contact insurers on the

employer's behalf, obtain quotes for coverage, present coverage alternatives to the employer, and advise the employer on the various options.

{¶6} Brokers generally receive compensation through the insurance companies for the sale of their products. All insurers pay a base commission to their broker, which is generally calculated as a percentage of the insurance premium paid by the client. There are other forms of compensation, such as bonuses for new business placed with the insurer or retention bonuses for clients who renew their coverage. Brokers are not required to disclose the compensation received from insurance companies unless the client requests that information. Confidentiality agreements between brokers and insurance companies are common within the industry.

{¶7} Aultman originally marketed its managed care plans through its own in-house sales force. In 1997, Aultman changed its methods to increase its sales from independent brokers and created the Conversion Support Program ("CSP") to increase AultCare membership. The CSP was a bonus program established by Aultman for a select group of brokers. The amount of the bonus was dependent on the number of "lives" converted to the AultCare insurance program. A broker could be paid up to $200 for every "life" the broker converted to AultCare. Aultman paid the brokers 60% of the bonus in the first year if the broker's client selected AultCare as their health insurance provider and the broker would receive the remaining 40% bonus if the client renewed with AultCare for two additional years. The brokers were required to sell a minimum amount of business to qualify for the bonus, and had to maintain a specified retention rate. The broker was penalized with fines of $40 per "life" if the broker failed to retain up

to 97% of their AultCare lives per year. If the client did not renew with AultCare, the broker would not receive the remaining 40% bonus.

{¶8} The brokers who participated in the CSP were required to enter into confidentiality agreements where the broker could not inform their clients they were receiving compensation from Aultman if the client chose AultCare as their insurance provider. In 2004, Aultman waived the confidentiality provision.

{¶9} The launch of the CSP caused AultCare to become the major health insurance provider in the area. Over a 13-year period, 1,739 employer groups selected AultCare as their insurance provider for which their broker received the CSP bonus.

{¶10} On December 27, 2007, Mercy filed a Complaint against AHF, Aultman Hospital, AultCare, and McKinley Life Insurance Company (hereinafter collectively "Aultman"). In its Complaint, Mercy asserted seven causes of action: three anti-trust claims, tortious interference with business relations, deceptive trade practices, unfair competition, and civil conspiracy. The primary challenge of Mercy's Complaint involved the CSP. Aultman filed an Answer and Counterclaim alleging defamation, unfair competition, and frivolous litigation.

{¶11} Mercy amended its Complaint on December 19, 2008, to add a claim under the Ohio Corrupt Practices Act ("POCA") statute, R.C. 2923.31, et seq. Mercy alleged Aultman formed a criminal enterprise with the brokers involved in the CSP and engaged in a corrupt activity involving violations of 18 U.S.C. 1954.

{¶12} Aultman filed eight motions for summary judgment and Mercy filed one motion for summary judgment. The trial court denied all motions.

{¶13} The matter proceeded to a jury trial in April 2010. After eight weeks for trial, the case was submitted to the jury. The jury found for Mercy on only one of its claims, finding Mercy had proved by a preponderance of the evidence that Aultman violated the Ohio Pattern of Corrupt Activities statute. The jury found for Aultman on all of Mercy's other claims. The jury further found in favor of Mercy on Aultman's unfair competition counterclaim. The trial court granted Mercy's motion for directed verdict on the remainder of Aultman's counterclaims. The jury awarded Mercy $6,148,000 in damages. The trial court entered judgment on the verdict on June 17, 2010.

{¶14} On June 25, 2010, Mercy moved for prejudgment interest, attorney's fees, expert fees, and injunctive relief. Aultman filed its Motion for Judgment Notwithstanding the Verdict and/or New Trial on July 1, 2010.

{¶15} The trial court ruled on the motions on October 19, 2010. The trial court overruled Aultman's Motion for Judgment Notwithstanding the Verdict and/or New Trial. The trial court granted Mercy's motion for attorney's fees pursuant to POCA in the amount of $4,000,000 and denied its motion for litigation costs, including expert fees. Finally, the trial court granted Mercy's motion for injunctive relief under R.C. 2923.34(B)(2), awarding the City of North Canton $75,600 and $190,800 to Stark County Commissioners.

## ASSIGNMENTS OF ERROR

{¶16} It is from these judgment entries Aultman now appeals, raising five Assignments of Error:

{¶17} "I. THE TRIAL COURT ERRED IN FAILING TO SET ASIDE THE VERDICT AND/OR GRANT A NEW TRIAL DUE TO NUMEROUS ERRORS IN THE

PATTERN OF CORRUPT ACTIVITY ("POCA") VERDICT. (OCT. 19, 2010 JUDGMENT ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR FOR A NEW TRIAL).

{¶18} "II. THE TRIAL COURT ERRED IN FAILING TO SET ASIDE THE DAMAGES AWARD, WHICH IS NOT AUTHORIZED UNDER POCA. (OCT. 19, 2010 JUDGMENT ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT).

{¶19} "III. THE TRIAL COURT ERRED IN FAILING TO ORDER A NEW TRIAL DUE TO PERVASIVE, FUNDAMENTAL ERRORS IN THE TRIAL. (OCT. 19, 2010 JUDGMENT ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR FOR A NEW TRIAL).

{¶20} "IV. THE TRIAL COURT ERRED IN AWARDING AN EXCESSIVE AMOUNT OF ATTORNEY'S FEES. (OCT. 19, 2010 JUDGMENT ENTRY ON MERCY'S MOTION FOR ATTORNEY'S FEES).

{¶21} "V. THE TRIAL COURT ERRED IN ORDERING UNNECESSARY AND IMPROPER INJUNCTIVE RELIEF. (OCT. 19, 2010 JUDGMENT ENTRY ON MERCY'S MOTION FOR INJUNCTIVE RELIEF)."

**I.**

{¶22} In its first assignment of error, Aultman claims the trial court erred in not setting aside the jury's verdict on Mercy's POCA claim, or granting it a new trial.

{¶23} Ohio Civil Rule 50 governs motions for directed verdicts, judgments notwithstanding the verdict and new trial, and reads, in pertinent part:

{¶24} "(A) Motion for a directed verdict

{¶25} "***

{¶26} "(4) *When granted on the evidence.* When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶27} "(B) Motion for judgment notwithstanding the verdict

{¶28} "Whether or not a motion to direct a verdict has been made or overruled and not later than fourteen days after entry of judgment, a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned such party, within fourteen days after the jury has been discharged, may move for judgment in accordance with his motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no verdict was returned the court may direct the entry of judgment or may order a new trial."

{¶29} When ruling on a motion for judgment notwithstanding the verdict, a trial court applies the same test as in reviewing a motion for a directed verdict. *Ronske v. Heil Co.,* 5th Dist. No. 2006-CA-00168, 2007-Ohio-5417; *See also*, *Pariseau v. Wedge*

*Products, Inc.*, 36 Ohio St.3d 124, 127, 522 N.E.2d 511 (1988). "A motion for judgment notwithstanding the verdict is used to determine only one issue i.e., whether the evidence is totally insufficient to support the verdict." *Krause v. Streamo,* 5th Dist. No. 2001CA00341, 2002-Ohio-4715, ¶14; *see also*, *McLeod v. Mt. Sinai Medical Center*, 166 Ohio App.3d 647, 2006-Ohio-2206, 853 N.E.2d 1235 (8th Dist.), reversed on other grounds, 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201. Neither the weight of the evidence nor the credibility of the witnesses is a proper consideration for the court. *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). *See also*, Civ.R. 50(B); and *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986). In other words, if there is evidence to support the nonmoving party's side so that reasonable minds could reach different conclusions, the court may not usurp the jury's function and the motion must be denied. *Goodyear Tire & Rubber Co. v. Aetna Casualty & Surety Co.,* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835. Again, in ruling on a motion for judgment notwithstanding the verdict, the court does not determine factual issues, but only questions of law, even though it is necessary to review and consider the evidence in deciding the motion. *Goodyear* at ¶4.

{¶30} Appellate review of a ruling on either a motion for directed verdict or a motion for judgment notwithstanding the verdict is de novo. *Midwest Energy Consultants, L.L.C. v. Utility Pipeline, Ltd.,* 5th Dist. App. No. 2006CA00048, 2006-Ohio-6232; *Ronske v. Heil,* supra; *Cleveland Electric Illuminating Company v. Public Utility Commission,* 76 Ohio St.3d 521, 523, 668 N.E.2d 889 (1996), citation deleted.

{¶31} In addition, Civ.R. 59(A) states, in pertinent part:

{¶32} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

{¶33} "* * *

{¶34} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

{¶35} "(7) The judgment is contrary to law;

{¶36} "* * *;

{¶37} "(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

{¶38} "In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown."

{¶39} Our standard of appellate review on a motion for new trial is abuse of discretion. *Anthony v. Hunt*, 5th Dist. No. 1997CA00170, 1998 WL 172942 (Feb. 9, 1998). In reviewing a decision on a motion for new trial, an appellate court must view the evidence in a light most favorable to the trial court's decision, rather than in favor of the nonmoving party. *See Jenkins v. Krieger*, 67 Ohio St.2d 314, 320, 423 N.E.2d 856 (1981).

{¶40} Ohio's POCA statute is based on the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and requires a plaintiff to prove the following elements:

{¶41} "(1) That conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses;

{¶42} "(2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity, and

{¶43} "(3) that the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise." *Schlender Enters., LP v. Reese*, 3ʳᵈ Dist. Nos. 2-10-16, 2-10-19, 2010-Ohio-5308, ¶31.

{¶44} Mercy relies upon 18 U.S.C. 1954, part of federal ERISA (Employee Retirement Income Security Act) legislation, to establish Aultman's "corrupt activity." An 18 U.S.C. 1954 violation has four elements:

{¶45} (1) the defendant gave a "fee, kickback, commission, gift, loan, money, or thing of value" to

{¶46} (2) a person that provides services to an ERISA "benefit plan," and

{¶47} (3) the payment was made "because of or with intent to…influence [ ]", the actions or decisions of the person providing services to the ERISA plan;

{¶48} (4) and the payment was not bona fide compensation for services rendered.

{¶49} Aultman's fundamental argument is payments to encourage brokers to sell an insurer's products (be they characterized as commissions or bonuses) do not violate 18 U.S.C. 1954.  Aultman primarily relies upon a California federal district court opinion to support its argument.  (*See Sante Mineral Waters, Inc. v. Schotz, N.D. Calif.* (1991), 1991 U.S. Dist. Lexis 11347.)  Aultman maintains virtually every insurance company offers incentive compensation intended to encourage brokers to offer and sell

their products[1], a fact Mercy's own expert, Frank Bitzer admitted, "generally speaking" was standard within the industry.

{¶50} Mercy counters evidence proved the CSP payments were designed to give its group of approximately ten selected brokers an unlawful incentive to convert employers they serviced and influenced to switch to AultCare products. We agree such evidence is extant in the record. The key issue becomes was there evidence upon which the jury could find the CSP payments were not "bona fide."

{¶51} In *United States v. McCord*, 33 F.3d 1434 (5th Cir. 1994), the United States Fifth Circuit Court of Appeals explained:

{¶52} "Although § 1954 does not define 'bona fide', we can easily discern its intended meaning by reading it as a whole. See, e.g., N. Singer, 2A Sutherland Statutory Construction § 46.05, at 103 (5th ed. 1992) ('each part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole'; 'it is not proper to confine interpretation to the one section to be construed') (footnotes omitted). Section 1954 first describes what is prohibited- inter alia, the receipt of a thing of value 'because of' any actions or decisions relating to the benefit plan. It then describes, in the exception, what is not prohibited- inter alia, the payment or acceptance of 'bona fide salary, compensation, or other payments ... for services actually performed in the regular course of ... duties'."

---

[1] Aultman argues within this assignment of error the trial court refused to give its requested instruction such compensation payments do not violate 18 U.S.C. 1954. Aultman has not separately assigned as error the trial court's failure to give the requested instruction and therefore we disregard the same pursuant to App.R. 12(A). See *Davidson v. Motorists Mut. Ins. Co.*, 91 Ohio St.3d 262, 744 N.E.2d 713 (2001).

{¶53} Aultman's insurance companies were already paying the CSP brokers standard commissions and bonuses for selling insurance. The CSP was designed to deliver extra money to select brokers and was intended to give Aultman more influence and control of their CSP brokers by creating an alliance. The CSP payments were secret and confidential at their inception.

{¶54} Rick Haines, President and CEO of AultCare and McKinley Life Insurance Company, testified regarding the penalty or clawback provision of the CSP. (Trial Tr., Vol. 8, at p. 40.) Haines conceded under the provision, a broker faced a monetary penalty if he searched for and presented a superior plan to a client, and the client chose the superior plan over AultCare. *Id.* at 41. Haines acknowledged the CSP was a confidential agreement between Aultman and the select brokers with confidentiality being a material condition of the agreement. *Id.* Brokers were penalized for breaches of confidentiality.

{¶55} Aultman used charitable assets from its tax-exempt Aultman Health Foundation to make the secret CSP payments even though the Aultman Health Foundation does not sell insurance or administer health plans, a practice that is not standard, but rather unique, to the industry.

{¶56} Edward Roth, Chief Executive Officer of Aultman Health Foundation, testified the CSP was "one hundred percent funded" by the Foundation. (Trial Tr., Vol. 6, p. 197.) Roth acknowledged the Foundation is a not-for-profit, 501(C)(3), charitable institution that neither sells insurance nor administers a managed care plan. *Id.* at 198. In fact, Roth conceded the Foundation, as a charitable not-for-profit institution, is not permitted to administer a managed care plan. *Id.* at 199. Roth further admitted the CSP

was unique in the industry as payment to the brokers was made by someone other than an insurance company. *Id.* He agreed it was not industry standard for a broker's compensation program to be funded by a non-insurance company. *Id.*

{¶57} Brokers receiving CSP payments were penalized if they failed to reach renewal and retention rates by reducing any accrued bonus not yet paid; effectively penalizing brokers for doing what they are supposed to do…shopping the market and taking a group of employees to a potentially better competing carrier.

{¶58} Mercy's expert, Burke Christiansen, a professor of insurance law at Eastern Kentucky University, explained the duties of an independent insurance broker. (Trial Tr., Vol. 7, p. 95.) Christiansen noted the broker's responsibility is to act in the best interest of his/her client, the employer, finding the employer's business the best group health insurance product for his/her employees. *Id.* Christiansen testified the CSP did not reward brokers for doing their jobs. *Id.* at 120. Rather, the CSP included a holdback provision, which provided a percentage of a broker's additional commission was held back, and paid only after the broker renewed the group after a year or two. *Id.* at 121. If the group did not renew, the broker forfeited that percentage. *Id.* at 122. Christiansen explained this gave the broker an incentive to keep the group with AultCare. *Id.* Further, if a broker did not maintain a retention rate between 90% and 97%, the broker was penalized $40/life not retained. *Id.* at 124. Christiansen added the standard industry retention is 70%. *Id.*

{¶59} Aultman initially shrouded the CSP payments in secrecy, with breach by a broker resulting in forfeiture of all compensation received under the program, a practice not utilized within the industry. The confidentiality agreements which prohibited the

brokers from disclosing the CSP payments to their clients establish the compensation received was not bona fide. *See Moreland v. Behl*, N.D. No. C-92-1238MHP, 1996 WL 193843 (April 17, 1996), quoting *United States v. Schwimmer*, 924 F.2d 443 (2d Cir.), *cert. denied*, 502 U.S. 810 (1991); *See also Nyehling v. New York Life Ins. Co.*, 163 F.Supp.2d 502(E.D. Pa. 2001).

{¶60} We find when construing the evidence most strongly in favor of Mercy, the jury could determine the CSP payments were not bona fide; therefore, Mercy presented sufficient evidence to support the jury's verdict the numerous CSP payments to the brokers constituted a violation of Ohio's POCA act. We find the evidence was not "totally insufficient" to support the verdict. *Krause v. Streamo*, 5th Dist. No. 2001CA00341, 2002-Ohio-4715.

{¶61} Within this same assignment of error, Aultman asserts the trial court's jury instructions incorrectly shifted the burden of proof as to who must prove whether the compensation payments were "bona fide."

{¶62} As noted in our earlier discussion regarding Aultman's request the jury be instructed the insurance company's incentive compensation payments to brokers do not violate 18 U.S.C. 1954, Aultman has not chosen to separately assign as error the trial court's alleged erroneous instruction (See FN 1, ¶ 50 supra.) As such we disregard it.[2]

{¶63} In that same vein, Aultman complains the trial court's alleged erroneous jury instruction regarding who had the burden to prove the CSP payments constituted

---

[2] We note Aultman's brief fails to reference where in the trial record it timely objected to the instruction. Furthermore, we find Aultman's reliance on criminal case law less than persuasive as to the appropriateness of the trial court's instruction which followed Ohio Jury Instructions and Modern Federal Jury Instructions regarding 18 U.S.C. 1954.

bona fide compensation was particularly prejudicial because it incorrectly excluded a wide range of evidence relevant to that issue. Specifically, Aultman references the exclusion of the results of the Department of Labor's investigation of AultCare's Form 5500 disclosures, IRS audits, and the conclusions of the Ohio Department of Insurance regarding the CSP payments. Again, Aultman has failed to separately assign as error the alleged erroneous exclusion of this evidence. Accordingly, we disregard it as it pertains to the issue of alleged erroneous jury instructions which, as noted supra, was not separately assigned as error.

{¶64} Also within its first assignment of error, Aultman attacks the sufficiency of the evidence to support a finding Aultman participated in an "enterprise."

{¶65} To prove a POCA claim, a plaintiff must prove an agreement to commit the wrongful conduct and the defendant and a third person formed an ongoing organization with a defined structure and continuity that is separate from the pattern of wrongful conduct. *Morrow v. Reminger & Reminger Co. LPA.*, 183 Ohio App.3d 40, 59, 2009-Ohio-2665, 915 N.E.2d 69 (10th Dist.). Without evidence the conspirators are organized according to some internal hierarchy, have engaged in routinized activity, and have held specific rules and responsibilities, there is not structure and therefore, no enterprise. *Sears Roebuck & Co. v. Emerson Elec. Co.*, N.D. Illinois No. 01 C 8119, 2003 WL 22057251 (Sept. 3, 2003).

{¶66} Aultman argues because the jury found Mercy did not establish the existence of a conspiracy between Aultman and the CSP brokers[3], the evidence was

---

[3] See Jury interrogatory No. 5.

insufficient to establish the heightened requirement to establish an enterprise under POCA.[4] We disagree.

{¶67} "Ohio courts have held than an 'enterprise' should be interpreted broadly and need not be a formal, structured organization." *In re Nat'l. Century Fin. Enters., Inc., Invest. Litig.*, 604 F. Supp. 2d 1128, 1159 (S.D. Ohio 2009). This Court stated in *State v. Yates*, 5th Dist. No. 2009CA0059, 2009-Ohio-6622, a POCA enterprise requires an ongoing organization with associates that function as a continuing unit. It is not required an "enterprise" have an existence separate and apart from the underlying corrupt activity.

{¶68} Mercy counters the evidence at trial proved Aultman's enterprise with its CSP brokers in several ways. Aultman consistently referred to its association as a "team" whose purpose was to give it more influence or control of the CSP brokers' groups by creating an alliance. The terms of the secret CSP agreements created a functioning organization between Aultman and its team of brokers.

{¶69} The Aultman association had regular formal gatherings – annual retreats at resorts for which Aultman paid.

{¶70} We find there was sufficient evidence presented to support the jury's conclusion an "enterprise" existed under Ohio's POCA act.

{¶71} Aultman's final prong of its first assignment of error asserts the CSP did not proximately cause injury to Mercy. It is clear a plaintiff bringing a claim under POCA must prove its damages were proximately caused by the defendant's corrupt activity.

---

[4] We agree with Mercy, Aultman failed to properly preserve any issue regarding inconsistent interrogatories and the verdict by not referencing where in the record it raised the inconsistency before the jury was discharged.

*Lesick v. Manning*, 7th Dist. No. 91-C-70, 1992 WL 380284 (Dec. 17, 1992). The key is the directness of the relationship between the conduct and the harm, not the foreseeability. *Hemi Group, LLC v. City of New York*, _U.S._, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010); *Chaz Concrete Co., LLC. v. Codell*, E.D. Ky. No. 3:03-52.KKC, 2010 WL 1227750 (Mar. 29, 2010).

{¶72} Aultman maintains employers chose AultCare because it offered the most benefits at the most competitive prices. Aultman maintains no evidence existed any broker misrepresented or withheld any information regarding the costs, terms, or benefits of any AultCare product to an employer to induce them to select AultCare, nor was there evidence any CSP broker recommended Aultman when it was not in the best interests of the employer to do so. As such, Aultman argues Mercy's claim the CSP was the reason its clients were selecting AultCare was based on speculation.

{¶73} Aultman concludes its damage causation argument by claiming Mercy failed to show how the CSP payments caused individual employees to choose medical services from Aultman rather than Mercy.[5]

{¶74} In response, Mercy notes, unlike RICO, the Ohio POCA act specifically permits recovery for all damages directly *or indirectly* caused by Aultman's CSP payments. (Emphasis added.) R.C. 2923.34(E).

{¶75} Mercy notes Aultman made millions of dollars of secret CSP payments over and above the ordinary commissions and bonuses it was already paying its brokers and more than 1,700 employer groups covering 65,000 lives were converted to AultCare under the program. The CSP brokers were bringing virtually no business to

---

[5] In support, Aultman notes the jury's answers to interrogatories No. 3 and 4.

Aultman until the CSP was initiated. One CSP broker testified he moved 80% of his book of business to AultCare after the CSP went into effect.

{¶76} Mercy presented evidence its share of the market of privately insured patients dropped significantly after Aultman started the CSP and Mercy's damage expert testified Aultman generated over $190 million from services performed on the converted lives, and that a significant portion of those services would have been provided by Mercy.

{¶77} Given Ohio's recognition of recovery for indirect injury -- which is broader than the comparable federal RICO requirement -- we find the evidence was sufficient to support the jury's inference/conclusion Aultman's pattern of corrupt activities proximately caused damage to Mercy.

{¶78} Aultman's first assignment of error is overruled.

**II.**

{¶79} The jury found in jury interrogatory no. 6 Mercy proved by a preponderance of the evidence Aultman violated POCA by the use of the CSP. Based on their finding, the jury awarded Mercy $6,148,000 in compensatory damages. Aultman filed a motion for judgment notwithstanding the verdict on July 1, 2010 and argued the trial court should reject the jury's verdict under POCA because the statute does not authorize an award of actual damages where a POCA violation is proven only by the preponderance of the evidence. The trial court denied Aultman's motion as to the damages award on October 19, 2010. On appeal, Aultman argues in its second assignment of error this Court should vacate the damages award. We disagree.

{¶80} On March 24, 2010, Aultman submitted its proposed jury instructions.  As to the POCA cause of action, Aultman proposed the following instruction as introduction and elements of the POCA violation.  Aultman stated its authority for the instruction was "OJI-CV 445.01, OJI-CV 455.03."  The proposed instructions read:

{¶81} "Lastly, Plaintiff is seeking to recover damages that it claims were caused by Defendants engaging or conspiring to engage in a pattern of corrupt activity in violation of Ohio's Pattern of Corrupt Activity Act ('POCA').

{¶82} "To prevail on this claim against any Defendant, Plaintiff must prove all of the following elements by a preponderance, or greater weight, of the evidence respecting that Defendant:

{¶83} "(A) That the Defendant was a 'person' under the definition I will give you in a moment;

{¶84} "(B) That the Defendant was employed by or associated with an 'enterprise' separate and apart from the Defendant;

{¶85} "(C) That the Defendant conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity; and

{¶86} "(D) That Plaintiff was damaged, directly or indirectly, as a result of the Defendant's conduct.

{¶87} "I will now instruct you about the specific requirements of each of those elements."

{¶88} The trial court instructed the jury as follows concerning Mercy's claim Aultman violated POCA:

{¶89} "In a civil action, the burden is on both Mercy and Aultman to prove every essential element of their claims by the preponderance of the evidence. In addition, with respect to Mercy's claim under the Pattern of Corrupt Activities Statute you will also be asked whether Mercy has proven its case by clear and convincing evidence." (Trial Tr., Vol. 34, p. 18.)

{¶90} The trial court then instructed the jury as to the elements of a POCA violation:

{¶91} "You must decide whether Aultman violated the Ohio Pattern of Corrupt Activities Statute. To prevail on this claim Mercy prove all [sic] of the elements of the four-part test.

{¶92} "In order to find for Mercy on its Ohio Pattern of Corrupt Activities cause of action, you must find the following four elements by a preponderance of the evidence: one, that Aultman was a person as defined by the Ohio Pattern of Corrupt Activities Statute; two, that Aultman and the CSP brokers formed an association-in-fact enterprise; three, Aultman conducted or participated in directly or indirectly the affairs of the enterprise through a pattern of corrupt activity or conspired to do the same; and four, Mercy was injured directly or indirectly as a result of Aultman Defendant's conduct.

{¶93} "If you find that Mercy has shown each of the above four elements by a preponderance of the evidence your verdict should be for Mercy on this cause of action. * * *." (Trial Tr., Vol. 34, p. 53-55.)

{¶94} The jury instructions went on to recite the standards as to damages:

{¶95} "Damages. If you find that Mercy has proven all of the elements of this claim and that Aultman has failed to prove a viable defense to this claim, then you must

further decide the amount of damages to which Mercy is entitled. Mercy's damages can include compensatory damages and future damages." (Trial Tr., Vol. 34, p. 62.)

{¶96} After the trial court instructed the jury, the trial court took objections from the parties on the jury instructions. In its objections and relevant to this appeal, Aultman objected to the burden of proof on a POCA violation as follows:

{¶97} "In the initial instruction describing the burden of proof, the Court notes that Mercy's obligation under the Pattern of Corrupt Activities Statute was a clear and convincing burden, and yet when the Court instructed specifically on the Pattern of Corrupt Activities Statute it gave the jury an instruction by – of preponderance of the evidence and that inconsistent instruction with regard to burden of proof prejudices the Defendants." (Trial Tr., Vol. 34, p. 98.)

{¶98} Mercy then raised a question regarding a proposed jury interrogatory. (Trial Tr., Vol. 34, p. 158.) Mercy proposed a jury interrogatory where the jury would be asked if they found Mercy proved a POCA violation and its actual damages by clear and convincing evidence. Aultman objected to the proposed jury interrogatory, stating that based on the current jury instructions, utilizing a preponderance of the evidence standard of proof for a POCA violation and then including a jury interrogatory regarding the clear and convincing standard for a POCA violation would be inconsistent and prejudicial. (Trial Tr., Vol. 34, p. 159.) The trial court did not permit Mercy to include the jury interrogatory. *Id.* at p. 163.

{¶99} Aultman argued in its motion for judgment notwithstanding the verdict and on appeal in a civil POCA action under R.C 2923.34, there are only two remedies available to the plaintiff: injunctive relief and/or triple the actual damages the party

sustains. For each remedy, there exists a different standard of proof. Upon a showing of a violation of preponderance of the evidence, a plaintiff is entitled to equitable and injunctive relief under R.C. 2923.34(B). Treble damages will be awarded only upon a showing of a violation by clear and convincing evidence. *Schweisberger v. Weiner*, 5th Dist. Nos. 1994 CA 00291, 1995 CA 00367, 1995 WL 808866 (Dec. 12, 1995). R.C. 2923.34(E) provides:

{¶100} "In a civil proceeding under division (A) of this section, any person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, other than a violator of that section or a conspirator to violate that section, in addition to relief under division (B) of this section, shall have a cause of action for triple the actual damages the person sustained. To recover triple damages, the plaintiff shall prove the violation or conspiracy to violate that section and actual damages by clear and convincing evidence. Damages under this division may include, but are not limited to, competitive injury and injury distinct from the injury inflicted by corrupt activity."

{¶101} Aultman argues there is no statutory support for the award of actual damages where a POCA violation has been proven only by the preponderance of the evidence. Because Mercy failed to prove its actual damages by clear and convincing evidence, Aultman contends Mercy is not entitled to actual damages.

{¶102} Before considering Aultman's legal argument, we must first determine our standard of review. Aultman's appellate brief is silent as to where in the trial court proceedings Aultman objected to the utilization of the preponderance of the evidence standard of proof for the award of only actual damages under a POCA violation.

Aultman proposed a jury instruction regarding the award of compensatory damages under a preponderance of the evidence standard of proof for a POCA violation. Aultman did object to the jury instructions as to POCA; however, a review of the record shows that Aultman did not specifically object to the issue raised in its JNOV motion. Aultman objected to the trial court's use of the clear and convincing standard and the preponderance of the evidence standard in two parts of the instructions as conflicting, not as an incorrect statement of the law. Finally, Aultman objected to Mercy's proposed jury interrogatory utilizing the clear and convincing standard of proof for Mercy's POCA claim. We find Aultman failed to timely object to the jury instructions and verdict form. Aultman raised the argument regarding the preponderance of the evidence standard of proof for actual damages for the first time in its motion for judgment notwithstanding the verdict filed July 1, 2010.

{¶103} Civ.R. 51(A) provides, "[o]n appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." It is well settled the "failure to timely advise the trial court of a possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." (Citations omitted.) *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997).

{¶104} There was no timely objection to the error raised by Aultman. It was not until post-trial Aultman raised the argument as to the standard of proof under R.C. 2923.34. As such, we find the matter to be waived for purposes of appeal.

{¶105} While not raised in Aultman's merit brief, Aultman's argues in its reply brief this Court should apply the plain error doctrine to the damages issue. "[I]n appeals

of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, supra.

{¶106} We are not inclined to apply the plain error doctrine because Aultman raised the application of the doctrine in its reply brief. A reply brief is not the place for briefing new arguments that were not raised in appellant's brief. *See* App.R. 16(C). *See, also, State ex rel. Colvin v. Brunner,* 120 Ohio St.3d 110, 2008–Ohio–5041, 896 N.E.2d 979, ¶ 61. Accordingly, we shall not consider application of the plain error doctrine to Aultman's second assignment of error.

{¶107} Aultman's second Assignment of Error is overruled.

**III.**

{¶108} Herein, Aultman reasserts the trial court erred in not granting its request for a new trial. In addition to the arguments Aultman specifically raised related to Mercy's POCA claim, Aultman reasserts those same arguments we addressed in Assignment of Error No. 1 and raises two additional arguments why a new trial should have been granted.

{¶109} First, Aultman asserts the trial court erred by subjecting the four individual Aultman defendants to collective liability. Aultman concedes the four named defendants are part of a related corporate family but maintains they are nonetheless separate legal entities.

{¶110} A parent corporation is not liable for the acts of its subsidiaries.  *U.S. v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).  The separate legal identities of related corporations must be respected even where directors and officers serve in various capacities in multiple entities.  Sister corporations are not liable for the acts of each other.  *Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 468, 2009-Ohio-1247, 905 N.E.2d 613 (2009).

{¶111} Aultman maintains over its "repeated objections"[6] the jury was never asked to consider which of the individual four defendants violated POCA, but rather was allowed to return a verdict against "Aultman" collectively.

{¶112} Mercy needed to prove each defendant was a "person" participating in the affairs of an enterprise which committed a pattern of corrupt activity.  *De Falco v. Bernas*, 244 F.3d 286, 306, (2nd Cir. 2001).  Aultman maintains the trial court, not the jury, made a determination they were merely alter egos of each other and "pierce[d] the corporate veil" by subjecting each defendant to collective liability.  Though not separately assigned as error, Aultman notes the trial court repeatedly rejected the defendants' requested instructions, interrogatories, and verdict forms which would have required the jury to determine whether each of the defendants separately violated POCA.  Mercy counters the four defendants referred to themselves collectively as "Aultman" throughout the trial, acknowledging they are all part of the same corporate family.

{¶113} The trial court stated "all of the [Aultman] entities had a hand in the scheme that the jury ultimately found violated the POCA law."  (Oct. 19, 2010 Judgment

---

[6] Appellant's brief at p. 33.  Aultman does not reference where in the record it made its "repeated objections" as required by App.R. 16(A).

Entry, p. 3.) The CSP was funded by defendant Aultman Health Foundation to convert business to AultCare and McKinley Life, which in turn steered business to Aultman Hospital who, in turn, generated substantial revenue on the "converted" lives. While the CSP contracts stated they were between Aultman Health Foundation and the individual selected brokers, AultCare sometimes signed the agreements. It was AultCare and the brokers who entered into the related confidentiality agreements.

{¶114} Aultman Hospital is a wholly owned subsidiary of Aultman Health Foundation, as is McKinley Life. Aultman Health Foundation jointly owns AultCare with Stark Quality Care Physicians, Inc. The Aultman entities have overlapping board members with key executives holding high-level positions in, and who make decisions on behalf of, multiple Aultman entities. The trial court noted Aultman Health Foundation, Aultman Hospital, and AultCare all have the same address.

{¶115} AultCare and McKinley Life CEO Rick Haines admitted the Aultman entities acted as a single unit, with Aultman Health Foundation acting as the "banker" and "quarterback" for Aultman Hospital, McKinley Life, and AultCare. Haines stated Aultman generally treats its companies as a single entity - including the decision to create the CSP. As president and CEO of AultCare and McKinley Life, Haines answers to Aultman Health Foundation.

{¶116} Ed Roth is CEO of both Aultman Health Foundation and Aultman Hospital. Roth testified he had ultimate responsibility for all of the operation of the entire Aultman organization, including AultCare and McKinley Life.

{¶117} Based upon the above, we find there was sufficient evidence the four defendants participated in unison to carry out the CSP and collectively benefited from it.

We find any error from not requiring individual verdicts as to each defendant was not prejudicial because, as the trial court observed, the Aultman defendants are so collectively intertwined, it would be impossible for the jury to distinctly separate each entity's conduct.   For an analogous result see *Pravitsky v. Halczysak*, 8th Dist. No. 82295, 2003-Ohio-7057, rejecting separate verdict forms where the defendants acted as agents for one another in furtherance of their business interests.

{¶118} Aultman's second argument is it is entitled to a new trial because the trial court erred in refusing to give Aultman's proposed interrogatories to the jury.  Civ.R. 49(B) states, in pertinent part:

{¶119} "The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

{¶120} The Ohio Supreme Court has held, while it is mandatory the trial court submit to the jury properly drafted interrogatories, the court retains discretion to reject interrogatories that are inappropriate in form or content.  *See Freeman v. Norfolk & Western Ry.*, 69 Ohio St.3d 611, 613, 635 N.E.2d 310 (1994).  A court may reject a proposed interrogatory that is ambiguous, confusing, redundant, or otherwise legally objectionable.  *Freeman,* 69 Ohio St.3d at 613.  The standard under which we review a

trial court's decision whether to submit a proposed interrogatory is abuse of discretion. *Freeman,* 69 Ohio St.3d at 614.

{¶121} From our review of Aultman's proposed jury interrogatories and given the trial court's rationale for denying their inclusion as outlined in its October 19, 2010 judgment entry, the trial court did not abuse its discretion. It first appears Aultman did not comply with the trial court's orders to timely supplement its proposed jury instructions and interrogatories based on pre-trial rulings. Next, the trial court denied Aultman's numerous proposed interrogatories due to their burdensome and confusing nature.

{¶122} Interrogatories were presented to the jury in this case, albeit not the interrogatories prepared by Aultman. Mercy presented eight causes of action against Aultman and Mercy was only successful on its claim under POCA. We find neither an abuse of discretion nor prejudice to Aultman for the trial court's refusal to submit Aultman's proposed interrogatories to the jury.

{¶123} Aultman's third assignment of error is overruled.

**IV.**

{¶124} In the fourth assignment of error, Aultman contends the trial court awarded Mercy excessive attorney fees.

{¶125} "The decision of whether to award attorney fees rests in the sound discretion of the court and will not be overturned on appeal absent an abuse that of discretion." *Moore v. Moore,* 175 Ohio App.3d 1, 2008-Ohio-255, 884 N.E.2d 1113 (6th Dist.), ¶ 81.

{¶126} Aultman acknowledges a trial court shall award attorney fees to a prevailing plaintiff in a POCA action pursuant to R.C. 2923.34(F).[7] However, Aultman submits the attorney fees awarded by the trial court herein were excessive as Mercy prevailed on only one of its eight claims. Mercy requested attorney fees in excess of five million dollars. The trial court awarded Mercy four million dollars in fees. Aultman adds Mercy had the burden of proving the fees it requested were attributable to the successful claim and not to unrelated matters.

{¶127} In *Strip Delaware, L.L.C. v. Landry's Restaurants, Inc.*, 191 Ohio App.3d 822, 2010-Ohio-6403, 947 N.E.2d 1233 (5th Dist.), this Court addressed the propriety of a trial court's reduction of the attorney fees requested by landlord where the tenant had a partial claim of success. The trial court found the tenant was a prevailing party, albeit, on a limited issue. Therein, we noted:

{¶128} "A prevailing party is generally the party "'in whose favor the decision or verdict is rendered and judgment entered".' *Hagemeyer v. Sadowski* (1993), 86 Ohio App.3d 563, 566, 621 N.E.2d 707, quoting *Yetzer v. Henderson* (June 4, 1981), 5th Dist. No. CA–1967, 1981 WL 6293, at *2. See also *Falther v. Toney,* 5th Dist. No. 05 CA 32, 2005-Ohio-5954, 2005 WL 2995161.

{¶129} "The Eleventh District Court of Appeals has elaborated on this definition:

{¶130} "The prevailing party is '[t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though

---

[7] R.C. 2923.34(F) expressly provides: "In a civil action in which the plaintiff prevails under division (B) or (E) of this section, the plaintiff shall recover reasonable attorney fees * * *".

not necessarily to the extent of his original contention. The one in whose favor the decision or verdict is rendered and judgment entered. * * * This may be the party prevailing in interest, and not necessarily the prevailing person. To be such does not depend upon the degree of success at different stages of the suit, but whether, at the end of the suit, or other proceeding, the party who had made a claim against the other, has successfully maintained it.' *Lehto v. Sankey* (June 29, 2001), 11th Dist. No. 99-T-0137, 2001 WL 735898, at *7, as cited by the Ninth District Court of Appeals in *Moga v. Crawford,* Summit App. No. 23965, 2008-Ohio-2155, 2008 WL 1961216." *Id.* at ¶ 37-39.

{¶131} In *Strip Delaware, L.L.C.,* we found no error in the trial court's determination both parties were a "prevailing party" under the definition of the term. We further found the trial court did not abuse its discretion in equitably awarding less than the full amount of attorney fees based thereon. *Id.* at ¶ 40.

{¶132} Likewise, we find no error herein in the trial court's determination Mercy was a prevailing party on its POCA claim. However, this does not end our analysis. As stated, supra, Aultman contends the amount of attorney fees awarded by the trial court were excessive as Mercy prevailed on only one of its eight claims, yet the trial court awarded nearly 75 percent of the total fees Mercy expended during the entire course of the proceedings.

{¶133} In *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir. 1996), the United States Court of Appeals for the Sixth Circuit addressed a similar argument. The *Thurman* Court found:

{¶134} "The extent of a plaintiff's overall success must be considered in making an award of attorney fees. *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d

494 (1992); *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 910 (6th Cir.1991). However, a court should not reduce attorney fees based on a simple ratio of successful claims to claims raised. *Phelan v. Bell,* 8 F.3d 369, 374 (6th Cir.1993). When claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced." *Id.* at 1169.

{¶135} The *Thurman* Court continued:

{¶136} "Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

{¶137} In the instant action, the majority of Mercy's claims surrounded the CSP Program.  We find the unsuccessful aspects of Mercy's claims were "inextricably intertwined" with its successful claim such that the claims "involve[d] a common core of facts." See, *Hollingsworth v. Time Warner Cable*, 168 Ohio App.3d 658, 684, 2006-Ohio-4903, 861 N.E.2d 580 (1st Dist.).  Accordingly, we find the trial court did not abuse its discretion in the amount of attorney fees it awarded to Mercy.

{¶138} Aultman's fourth assignment of error is overruled.

**V.**

{¶139} In its fifth assignment of error, Aultman alleges the particular form of injunctive relief ordered by the trial court was improper. Specifically, Aultman maintains the order to pay money to Stark County and the City of North Canton, neither of which were named as parties in the underlying lawsuit, was improper.

{¶140} The POCA statute authorizes a trial court to order injunctive relief when a POCA violation is committed "to ensure that the violation will not continue or be repeated" R.C. 2923.34(B). As part of its injunctive order, the trial court *sua sponte* ordered Aultman to pay North Canton and Stark County $266,400 representing the amount of CSP bonuses it paid its brokers resulting from conversion of their coverage to AultCare.

{¶141} While R.C. 2923.34(B) directs the trial court to consider the rights of absent parties when ordering injunctive relief, we agree with Aultman, a monetary award against it is outside the scope of injunctive relief. We agree with Aultman to award damages against it in favor of non-parties raises serious due process concerns. Public entities are excluded from the definition of employee benefit plans under ERISA, do not fall under 18 U.S.C. 1954, and therefore would not support a POCA violation based thereon. If the CSP brokers received unethical double recovery, it would seem litigation against them by the aggrieved governmental agencies would be the appropriate remedy to pursue.

{¶142} Aultman's fifth assignment of error is sustained.

{¶143} The judgment of the trial court is affirmed, in part; and reversed, in part.

Hoffman, P.J.

Delaney, J.  and

Carr, J. concur

s/ William B. Hoffman
HON. WILLIAM B. HOFFMAN


s/ Patricia A. Delaney
HON. PATRICIA A. DELANEY


s/ Donna J. Carr
HON. DONNA J. CARR

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

CSAHA/UHHS-CANTON, INC.          :
DBA MERCY MEDICAL CENTER         :
                                 :
    Plaintiff-Appellee           :
                                 :
-vs-                             :          JUDGMENT ENTRY
                                 :
AULTMAN HEALTH FOUNDATION         :
AULTMAN CORPORATION               :
AULTMAN HOSPITAL, AND             :
MCKINLEY LIFE INSURANCE           :
COMPANY                          :
                                 :
    Defendants-Appellants        :          Case No. 2010CA00303


For the reasons set forth in our accompanying Opinion, the judgment of the Stark

County Court of Common Pleas is reversed as to the monetary judgment in favor of the

City of North Canton and Stark County, but affirmed in all other respects.  Costs to

Appellants.


s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ Patricia A. Delaney_____
HON. PATRICIA A. DELANEY


s/ Donna J. Carr _____
HON. DONNA J. CARR